1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ALLIANZ GLOBAL RISKS US
     INSURANCE COMPANY, *et al.*,

                Case No. 21-cv-1202-BAS-BGS

12
                  Plaintiffs,

13
                  **ORDER GRANTING THE**
                  **GOVERNMENT'S MOTION TO**

14     v.
                  **DISMISS FOR LACK OF SUBJECT**
                  **MATTER JURISDICTION (ECF**

15   UNITED STATES OF AMERICA,
                  **No. 12)**

16
                  Defendant.

17

18        Before the Court is Defendant United States of America ("Government")'s motion

19   to dismiss this subrogation action for lack of subject matter jurisdiction pursuant to Federal

20   Rule of Civil Procedure ("Rule") 12(b)(1) ("Motion").[1]  (Mot., ECF No. 12.)  Plaintiffs

21   oppose[2] (Opp'n, ECF No. 13) and the Government replies (Reply, ECF No. 14)  The Court

22   finds the Motion suitable for determination on the papers submitted and without oral

23
24
25        [1] Alternatively, the Government moves for dismissal for failure to state a claim pursuant to Rule

26   12(b)(6).
     [2] Plaintiffs consist of Allianz Global Risks US Insurance Company, Endurance American Specialty

27   Insurance Company, Tokio Marine America Insurance Company, and XL Insurance America, Inc.
     Plaintiffs allege they are the subrogees of General Dynamics Corporation and National Steel and

28   Shipbuilding Company.  (Compl. ¶¶ 1–5, ECF No. 7.)

argument.  *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).  For the reasons set forth below, the Government's Motion is **GRANTED**.

## I.   BACKGROUND

### A.   Pertinent Facts

#### 1.   Building Basin No. 1

On January 1, 1991, National Steel and Shipbuilding Company ("NASSCO") leased from the San Diego Unified Port District ("Port") Building Basin No. 1 ("Basin"), which is "located at the eastern side of San Diego Bay" in San Diego, California.  (Compl. ¶ 5.) On the Basin's premises there is a "graving dock" NASSCO uses "for shipbuilding [and] other work related to vessels[.]"  (*Id.* ¶ 7.)  A "graving dock" essentially is a type of "dry dock":  "[a]n enclosed basin into which a ship is taken for underwater cleaning and repairing . . . [that] is fitted with watertight entrance gates which when closed permit the dock to be pumped dry."  *Dry Dock*, INTERNATIONAL MARITIME DICTIONARY 246 (2d Ed. 1961); *Graving Dock, id.* at 336 ("A drydock in which ships are repaired as opposed to a building dock, in which ships are built.").[3]  When the Basin's graving dock was pumped dry and its sea gate closed, the ocean waters from the San Diego Bay "would impart a substantial load to the sea gate, a portion of which was transferred from the gate's structural load member to" a "horizontal steel, structural support beam" ("Beam").  (*Id.* ¶¶ 21–22.)

#### 2.   NASSCO's Shipbuilding Contract with the Navy

On approximately March 9, 2016, the United States Navy ("Navy") entered a 176-page contract with NASSCO to design, build, and perform other work related to Navy vessels at the Basin ("Contract").  (*Id.* ¶ 15; Contract No. N0002416C2227A00022, Ex. 1

---

[3] Courts have looked to maritime-specific, dictionary sources to educate themselves as to the meaning of crucial maritime terms where, as here, those terms are not defined by the parties.  *See, e.g., Atl. Specialty Ins. Co. v. Thomassen*, No. 1:15-cv-00009-SLG, 2016 WL 4649804, at *6 n.55 (D. Alaska Sept. 6, 2016) (turning to the International Maritime Dictionary to decipher the meaning of the terms "ways," "gridiron," and "drydock" in insurance dispute involving a sunken vessel because parties had not provided definitions for such terms).

to Notice of Lodgment, ECF No. 12-2.)  The Contract explicitly requires certification of "[d]rydocking and shipping ways employed [by NASSCO] in [its] performance of th[e] [C]ontract . . . in accordance with MIL-STD-1625D (SH), dated 27 August 2009, Safety Certification Program [(SCP)] for Drydocking Facilities and Shipbuilding Ways for U.S. Ships" ("Military Standard 1625D").  (Compl. ¶ 16; Contract 34; *see also* Military Standard 1625D, Ex. 2 to Notice, ECF No. 12-3.)[4]

As set forth in Military Standard 1625D, the SCP's purpose is:

> To ensure the safety of U.S. Navy ships during docking and undocking operations, while in dock, while under construction, and during launching and transfer operations.  The designed capacity of the drydocking facility is to be determined, as well as its current material condition with regard to its foundations, structure, and supporting auxiliary systems, including those for ship protection.  Also included is an assessment of operating procedures, manning, and personnel.

(Military Standard 1625D § 1.1.1.)  By its terms, Military Standard 1625D and the SCP delineated therein apply to the Basin's graving dock.  (*Id.* § 1.2.)

To "ensure the dock is in satisfactory condition to safely operate[,]" the SCP requires the facility's "operator," here, NASSCO, to "implement a maintenance program subject to Navy external audits at three-year intervals."  (Military Standard 1625D §§ 4.9.1, 4.9.2.) Among other things, the maintenance program mandates the operator to undertake "control inspections" for the purpose of "record[ing] the condition of the facility," "identify[ing] deficiencies," and "evaluat[ing] the effectiveness of preventative maintenance and deficiency correction procedures."  (*Id.* § 4.9.3.2.)  Components of a facility deemed "[s]tructures" within the meaning of Military Standard 1625D must be evaluated "at 2-year intervals," subject to deviation "to accommodate drydock operations and other significant

---

[4] The Contract is marked by multiple paginations—bates stamp numbers at the bottom righthand corner of each page of the document and the pagination set forth in the Contract itself.  Accordingly, the Court's citations to the Contract refer to the pagination assigned by the Public Access to Court Electronic Records ("PACER") system.

conflicts that prevent accomplishment on schedule." (*Id.* § 4.9.3.2(a).)  Section 5.2 of Military Standard 1625D sets forth the detailed control-inspection requirements and certification standards for "Graving Docks." (Military Standard § 5.2.)

While NASSCO—as the Basin's "operator"—is responsible for conducting control inspections (*see* Military Standard 1625D §§ 4.9.1, 4.9.3.2(b)), the Navy is required to "provide oversight" in connection therewith (*id.* § 4.9.3.2.1).  In particular, Navy personnel "shall":[5]

- "[A]ccompany commercial activities during control inspections." (*Id.* § 4.9.3.2.1(a));

- "[R]eview the activity's control inspection results for accuracy and completeness and concur with the results based on their observations during the inspections.  If the inspection results are determined to be inaccurate or incomplete, the activity shall be required to determine the reason for the discrepancies and to implement corrective action by modifying their inspection procedures or inspector qualifications as applicable to correct the inspection results." (*Id.* § 4.9.3.2.1(b));

- "[V]erify qualifications of activity's control inspection personnel[.]" (*Id.* § 4.9.3.2.1(c));

- "[R]eview inspection instructions for divers and be present during the briefing of the divers to ensure that divers understand their inspection responsibilities." (*Id.* § 4.9.3.2.1(d)); and

- "[M]aintain records of control inspection reviews and inspector qualifications for the triennial Navy maintenance audit." (*Id.* § 4.9.3.2.1(e).)

Notably, Military Standard 1625D states in its Foreword that "[t]he operating activity," *i.e.*, NASSCO, "remains solely responsible for maintaining and operating the facility in a safe manner and condition." (Foreword ¶ 5, Military Standard 1625D.)

---

[5] The Naval components responsible for the oversight functions set forth in Section 4.9.3.2.1 of Military Standard 1625D are the Supervisor of Shipbuilding, Conversion, and Repair and the Regional Maintenance Center. (*See* Military Standard 1625D §§ 3.1.16, 3.1.18, 4.9.3.2.1.)

Moreover, the Contract expressly provides "the Government does not assume the risk of and will not pay for the costs of any loss, damage, liability or expense caused by, resulting from, or incurred as a consequence of *delay or disruption* of any type whatsoever." (Contract 69–70 (emphasis added).)

### 3. Control Inspections of the Basin

Plaintiffs allege that at some time prior to July 11, 2018, NASSCO and Navy personnel "observed spalling[6] of concrete above the Beam and acknowledged a need to repair the spalling in reports." (Compl. ¶ 26.) Nevertheless, NASSCO and Navy personnel allegedly did not once undertake a control inspection of the Beam, despite the Beam assertedly constituting a "structure" within the meaning of Military Standard 1625D and Military Standard 1625D's requirement that structures must be inspected on a biennial basis. (*Id.* ¶¶ 25, 27–28.)

### 4. Sea Gate Failure

On approximately July 11, 2018, the Beam failed apparently due to "gradual, substantial corrosion" ("Incident"). (Compl. ¶ 29; *see also id.* ¶¶ 34, 36 (alleging post-Incident investigation revealed "[s]evere corrosion" of the Beam caused the sea gate failure).) When the Beam failed, the sea gate collapsed, causing ocean water from San Diego Bay to flood the Basin. (*Id.* ¶ 32; *see also* Mem. 3.) The Incident allegedly caused damage to property in which NASSCO and General Dynamics Corporation ("GDC") had insurable interests.[7]

### 5. Insurance Claims

After the Incident, NASSCO and GDC submitted insurance claims to Plaintiffs for damages caused by the Beam failure. (Compl. ¶ 37.) Plaintiffs paid insurance benefits on "losses arising from the Incident" corresponding to (1) "business interruption and claim

---

[6] "Spalling" is synonymous with the words "chipping," "splitting," and "fragmenting." *Spalling*, OXFORD ENGLISH DICTIONARY (Online Ed.) (accessed Apr. 27, 2022)

[7] As explained at *supra* note 2, the Complaint also names GDC as Plaintiffs' subrogor, but the Complaint is devoid of facts explaining GDC's involvement in the Contract or why it held insurable interests in property at the Basin. (Compl. ¶ 5.)

preparation expenses"; (2) "real property damage"; (3) "business personal property/equipment [damage]"; (4) "[lost] inventory"; and (5) "out-of-pocket extra expenses." (*Id.* ¶ 39.)

### B.   Procedural History

#### 1.   Complaint

On June 30, 2021, Plaintiffs commenced this subrogation action. (Compl.)  The Complaint asserts a single cause of action, which Plaintiffs style as a "negligence" claim. (*Id.* ¶¶ 56–65.)  As to each element of negligence,[8] Plaintiffs allege the following:

<u>Duty</u>.  Citing California's "negligent undertaking doctrine," Plaintiffs allege that the Navy owed NASSCO a duty of "reasonable care and skill" in the performance of "inspection and oversight services" set forth expressly in Military Standard 1625D. (Compl. ¶¶ 57–60 (citing *Allred v. Bekins Wide World Van Servs.*, 45 Cal. App. 3d 984, 989 (1975), and *Dekens v. Underwriters Labs. Inc.*, 107 Cal. App. 4th 1177, 1181–82 (Ct. App. 2003)).)

<u>Breach</u>.   Plaintiffs allege the Navy "negligently performed inspection and/or oversight services" because the Navy "failed to comply" with several provisions of Military Standard 1625D," including those provisions mandating that the Navy:

- "inspect or require inspection of the Beam . . . as part of control or structural inspections" pursuant to Sections 4.9.3.2(a) and (c), 4.9.3.2.1(a), 4.9.4.1, 5.2.5.4, and 5.2.5.4.2(a);

- "include or require inclusion of the Beam as an individual item listed on the inspection checklists" pursuant to Sections 4.9.3.2(c) and 4.9.3.2.1(b);

- "require periodic gauging/ultrasonic testing of the Beam" pursuant to Section 5.2.5.4.6; and

---

[8] "To prevail in an action for negligence" under California law, "the plaintiff must demonstrate that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused plaintiff's injuries." *John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006) (citing *Wiener v. Southcoast Childcare Ctrs., Inc.*, 32 Cal. 4th 1138, 1145 (2004)).

21cv1202

- "evaluate or require evaluation of the Beam in response to observ[ed] of concrete spalling" pursuant to Section 5.2.5.4.

(*Id.* ¶ 61.)  Plaintiffs do not identify any basis for the Navy's purported breach other than its alleged noncompliance with Military Standard 1625D.

Causation and Damages.  Plaintiffs allege that the Navy's purported breach proximately and legally caused the Incident.  They seek approximately $13,800,998 in monetary damages arising out of the Incident.  (Prayer for Relief, Compl. at pp. 18–19.) Plaintiffs allege this amount takes into consideration both (1) the Contract's clause precluding the Navy's liability for any "loss, damage, liability, or expense caused by, resulting from, or incurred as a consequence of *delay* or *disruption* of any type whatsoever" and (2) that NASSCO is partially at fault for the Incident.  (Compl. ¶¶ 41, 48.)

Plaintiffs allege that this Court has subject matter jurisdiction over this action pursuant to the Federal Torts Claim Act ("FCTA"), 28 U.S.C. § 1346 *et seq.*  (Compl. ¶ 12.)

## 2.      Motion to Dismiss

On January 17, 2022, the Government moved to dismiss this action pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  (*See* Mem. 7–13.)  It argues that although Plaintiffs cast their cause of action as "negligence," their claim really is one for breach of contract and, thus, this Court lacks jurisdiction under the FTCA.  Rather, the Government avers jurisdiction over this action lies exclusively with the United States Court of Federal Claims ("Court of Federal Claims") under both the Tucker Act, 28 U.S.C. § 1491(a)(1), *et seq.*, and the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104, *et seq.*  (*Id.*)

Plaintiffs oppose the Government's jurisdictional challenge.  (Opp'n 6–13.)  They contend their action falls under the purview of the FTCA that grants jurisdiction to federal district courts over claims by plaintiffs alleging the Government caused "injury or loss to property" through the Government's negligent acts or omissions.   (*Id.* 6 (citing 28 U.S.C. § 1346(b)(1).)

//

- 7 -

## II.   LEGAL STANDARD

### A.   Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) challenges a federal court's subject matter jurisdiction.  Where, as here, a Rule 12(b)(1) motion is filed alongside other Rule 12 motions, courts should consider the jurisdictional issue first, which "does not require" analysis of the merits.  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  They "possess only that power authorized by Constitution and statute." *Id.*  "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*; *see also Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

A Rule 12(b)(1) jurisdictional challenge may be either facial or factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial challenge to subject matter jurisdiction, a defendant asserts that the allegations in the complaint are insufficient to establish jurisdiction as a matter of law.  *Whisnant v. United States*, 400 F.3d 1177, 1199 (9th Cir. 2005).  Where a defendant launches such a challenge, the court will accept the plaintiff's allegations as true and will not look beyond the four corners of the complaint and the documents attached thereto or incorporated by reference therein.  *Id.*  On the other hand, where a defendant launches a factual challenge to jurisdiction it disputes the truth of the complaint's allegations that, by themselves, would otherwise invoke jurisdiction.  *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).  Under a factual attack, "the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *Id.*

### B.   Sovereign Immunity

"Where the United States is a defendant, a mere showing of federal jurisdiction does not suffice." *United Aeronautical Corp. v. United States Air Force*, No. 2:20-CV-1095-ODW (JDEx), 2021 WL 794500, at *3 (C.D. Cal. Mar. 2, 2021); *see N. Side Lumber Co.*

*v. Block*, 753 F.2d 1482, 1484 (9th Cir. 1985) ("[T]he analysis of jurisdiction cannot stop with [28] § 1331, because the claims in this case are in essence against the federal government . . . ."). That is because the United States "is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011) (quoting *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981)); *see also Gabriel v. Gen. Servs. Admin.*, 547 F. App'x 829, 830 (9th Cir. 2013) ("The United States is immune from suit unless it has expressly waived its sovereign immunity by consenting to be sued[.]"). The United States' consent to suit is a prerequisite for jurisdiction. *See McGuire v. United States*, 550 F.3d 903, 910 (9th Cir. 2008). Without a waiver of sovereign immunity, federal courts lack subject matter jurisdiction over cases against the government. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983). "The party who sues the United States bears the burden of pointing to such an equivocal waiver of immunity." *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir. 1983) (citing *Cole v. United States*, 657 F.2d 107, 109 (7th Cir. 1981)).

Relevant to the instant Motion are three limited, congressional waivers of sovereign immunity: the FTCA; the Tucker Act; and the CDA.

### 1. FTCA

The FTCA "'waives the sovereign immunity of the United States for actions in tort' and 'vests the federal district courts with exclusive jurisdiction over suits arising from the negligence of Government employees.'"[9] *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 855 (9th Cir. 2011) (quoting *Jerves v. United States*, 966 F.2d 517, 518 (9th Cir. 1992)); *Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435, 1439–40 (2019) ("Congress enacted the FTCA to waive immunity from tort suits involving agencies across the federal government."); *see also* 28 U.S.C. § 1346(b)(1) (waiving suits for "money damages . . . for

---

[9] The FTCA has an exhaustion requirement, whereby a claimant must "seek an administrative resolution of [its] claim" before filing suit in federal district court. *Jerves*, 966 F.2d at 518 (citing 28 U.S.C. § 2675(a)). The Navy does not contest Plaintiffs complied with that essential jurisdictional requirement. (*See also* Compl. ¶¶ 50–55 (alleging adherence to FTCA's exhaustion procedures).)

injury or loss of property . . . caused by the negligent or wrongful act or omission of an employee of the Government while acting within the scope of his office or employment, under circumstances where, the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred").

### 2.    Tucker Act and CDA

Through the Tucker Act, Congress also carved out a limited waiver of the United States' sovereign immunity over "any claim against the United States . . . upon any express or implied contract with the United States" that seeks more than $10,000 in damages. *N. Side Lumber*, 753 F.2d at 1484 (quoting 28 U.S.C. § 1491(a)(1)). Unlike the FTCA, however, the Tucker Act confers "exclusive" jurisdiction to the Court of Federal Claims over claims falling thereunder. *McGuire*, 550 F.3d at 911; *but see In re Liberty Constr.* 9 F.3d 800, 801 (9th Cir. 1993) ("[J]urisdiction under the Tucker Act is not exclusive where other statutes independently confer jurisdiction and waive sovereign immunity." (quoting *Pacificorp v. Fed. Energy Regulatory Comm'n*, 795 F.2d 816, 826 (9th Cir. 1986) (Wallace, J., concurring))).

The CDA also contains an even narrower waiver of sovereign immunity for contract claims against the Government. *See Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370 (Fed. Cir. 2009). Specifically, the CDA waives immunity for claims arising out of "any express or implied contract . . . made by an executive agency for procurement of property or services, other than real property." 41 U.S.C. § 7102(a). However, like the Tucker Act, the CDA grants exclusive jurisdiction to claims covered under its provisions to the Court of Federal Claims. *See United States v. Suntip Co.*, 82 F.3d 1468, 1474–75 (9th Cir. 1996) (citing *Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985)); *but see Wright v. United States Postal Serv.*, 29 F.3d 1426, 1431 (9th Cir. 1994) (citing *In re Liberty Construction*, 9 F.3d at 801, and holding CDA does not divest district courts of jurisdiction where independent statutory basis for jurisdiction over claim exists).

21cv1202

Hence, while the Tucker Act and CDA's limited waivers of sovereign immunity are not identical, "both ultimately divest district courts of jurisdiction over claims concerning contracts with the government." *United Aeronautical*, 2021 WL 794500, at \*4.

## III.   ANALYSIS

By its Motion, the Government argues this Court lacks subject matter jurisdiction over Plaintiffs' action because the single claim alleged in the Complaint does not fit within the FTCA.  No amount of massaging, the Government asserts, can support a construction of Plaintiffs' cause of action as "negligence."  The Government contends that Plaintiffs effectively allege the Navy breached an "express . . . contract with the United States" and, thus, the Tucker Act and CDA mandate their case be heard by the Court of Federal Claims only.[10]  (Mem. 6–13.)

To resolve this jurisdictional dispute, the Court must undertake two inquiries.  It first must assess whether Military Standard 1625D creates enforceable contractual rights.  Then, it must determine whether Plaintiffs' claim is based "upon breach by the government of a promise made by it in a contract," or whether Plaintiffs' action exists independently as a tort.  *Woodbury v. United States*, 313 F.2d 291, 295 (9th Cir. 1963).

For the reasons stated below, this Court agrees with the Navy that Plaintiffs' claim fits within the Tucker Act and CDA, not the FTCA.  Accordingly, the Court **GRANTS** the Motion and **DISMISSES WITHOUT PREJUDICE** this action.

//

//

//

---

[10] The Court notes the Government's Motion is a facial challenge to subject matter jurisdiction. The Government does not contest the truthfulness of Plaintiffs' allegations; rather, it avers that Plaintiffs improperly style their cause of action as one sounding in negligence.  And although the Government proffers, unopposed, extraneous documents for this Court's consideration—the Contract and Military Standard 1625D—those documents are incorporated by reference to the Complaint.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (instructing that Courts may consider as though part of the pleading extraneous documents upon which the pleading relies or to which it extensively refers, under the doctrine of incorporation by reference); *see also United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

### A.     Incorporation by Reference of Military Standard 1625D

The Court observes that, standing alone, Military Standard 1625D is not a contractual instrument.  *See Lockheed Martin Corp. v. England*, 424 F.3d 1199, 1206 (Fed. Cir. 2005) (holding that a military standard can have legal effect of contract if it is incorporated by reference into an instrument); *see also Cleek Aviation v. United States*, 19 Cl. Ct. 552, 554 (Cl. Ct. 1990).  While it appears both parties assume the Contract explicitly incorporates by reference Military Standard 1625D,[11] this Court feels it is necessary to probe this presumption given that Military Standard 1625D's legal effect is essential to the underlying jurisdictional issue presented in the instant Motion.[12]

It is well-established that federal law governs interpretation of contracts to which the Government is a party.  *United States v. Allegheny Cty.*, 322 U.S. 174, 183 (1944) ("The interpretation of federal government contracts is largely governed by federal common law of contracts."); *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005) ("Federal law governs the interpretation of contracts entered into pursuant to federal law and to which the government is a party." (citing *O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir. 1995))).[13]  When employing federal common law to interpret the

---

[11] The Government conclusively states in its opening brief that the Contract "incorporate[s] [Military Standard 1652D] by reference," where it provides "[d]rydocking facilities and shipbuilding ways employed in the performance of this contract shall be certified in accordance with [Military Standard 1652D]."  (Mem. 3 (citing Contract 33).)  But the Government does not provide any accompanying analysis or authority for that legal premise.  Nevertheless, Plaintiffs do not oppose the Government's assertion that Military Standard 1652D creates enforceable rights and obligations.  In fact, Plaintiffs appear to *agree* with that notion.  (*See, e.g.*, Opp'n 2 ("[Military Standard 1652D] *mandates* participation by the Navy in various aspects of the [graving dock] certification process, *e.g.*, inspections . . . ." (emphasis added)).

[12] The Contract itself does not require the Navy to provide "oversight" of NASSCO's "control inspections" of the Basin's graving dock, nor does it describe what form that oversight must take.  That information resides exclusively within Military Standard 1625D.  But if Military Standard 1625D is not contractual in nature and, thus, the Navy's promises set forth therein to oversee NASSCO's control inspections are not enforceable ones, then it cannot be said Plaintiffs assert, in substance, a breach of contract action for the Navy's alleged failure to comply with that Standard.  *See, e.g., Crewzers Fire Crew Trans., Inc. v. United States*, 741 F.3d 1380, 1382–83 (Fed. Cir. 2014) (holding essential predicate of breach of contract claim is a valid and enforceable contract).

[13] Although the Ninth Circuit "ha[s] recognized limited circumstances in which state law may apply to the interpretation of a federal contract, such as when the United States is not a party, or when the

provisions and meaning of a contract, courts may look to "general principles for interpreting contracts." *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012) (quoting *Klamath Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)).

One such "general principle" is that "[w]here a contract incorporates by reference the contents of another writing, the two documents constitute one agreement and should be read together." *See generally Colden v. Asmus*, 322 F. Supp. 1163, 1165 (S.D. Cal. 1971). Williston on Contracts—perhaps the leading treatise on contract law—provides:

> Generally, all writings which are part of the same transaction are interpreted together. One application of this principle is the situation in which parties have expressed their intention to have one document's provision read into a separate document. As long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned.

Williston on Contracts § 30:25 (4th ed. 2021) (footnotes omitted).

With this general principle in mind, the Court finds significant that, in interpreting the provisions of government contracts, the Federal Circuit has explicitly held federal common law recognizes the doctrine of incorporation by reference. *See, e.g.*, *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("To incorporate by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found[.]"); *Dobyns v. United States*, 915 F.3d 733, (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1106 (2020) ("[L]anguage used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must

---

direct interests and obligations of the government are not in question," the instant action does not present one of those limited circumstances. *Smith*, 418 F.3d at 1034 (citing *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 890 (9th Cir. 1992)).

clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008))).

This Court agrees with the parties that the Contract incorporates by reference Military Standard 1625D. The Contract expressly identifies precisely that it seeks to incorporate the SCP and indicates that the SCP is found in Military Standard 1625D. (Contract 86–87 ("Drydocking facilities and shipbuilding ways employed in the performance of this contract shall be certified in accordance with [Military Standard 1625D], dated 27 August 2009, [SCP] for Drydocking Facilities and Shipbuilding Ways for U.S. Navy Ships.").)  This conclusion rests on all fours with *Lockheed Martin Corp. v. England*, 424 F. Supp. 1199, 1206 (2005), in which the Federal Circuit held that agreements between the Navy and contractors can incorporate by reference military standards. *Id.* at 1206 (incorporating by reference a military standard into primary contract *and* sub-contracts); *see also Cleek Aviation*, 19 Cl. Ct. at 554 (incorporating by reference military standard into primary contract).

Accordingly, Military Standard 1625D is "constructively part of the [Contract]," and, together, they are to be interpreted and construed as part of "a single instrument." Williston on Contracts § 30:25.

## B.   Whether the FTCA Applies

Having found Military Standard 1625D has the same legal effect as the Contract, the Court next turns to whether Plaintiffs appropriately couch their cause of action as a tort arising under the FTCA, or if Plaintiffs substantively allege breach of contract by the Navy for failing to comply with Military Standard 1625D, a claim over which the Court of Federal Claims has exclusive jurisdiction pursuant to the Tucker Act and CDA.

Courts do not allow a plaintiff's artful pleading to dictate whether a claim is tortious or contractual in nature for the purpose of determining if the FTCA or the Tucker Act and CDA apply. *See Rowe v. United States*, 633 F.2d 799, 802 (9th Cir. 1980), *cert denied*, 451 U.S. 970 (1980) (holding plaintiffs cannot rely upon cunning pleading to "evade"

Court of Federal Claim's exclusive jurisdiction under Tucker Act); *LaPlant v. United States*, 872 F.2d 881, 882 (9th Cir. 1989), *withdrawn, replaced on reh'g*, 916 F.2d 1337 ("At the outset, we note that the language of appellant's complaint, which casts its claim for relief in terms of tort rather than contract, cannot be determinative in our inquiry."); *accord Putnam Mills Corp. v. United States*, 432 F.2d 554 (2d Cir. 1970) (per curiam) ("Plaintiff's attempt to classify his cause of action as a prima facie tort does not suffice to avoid the jurisdictional inhibitions on claims in deceit or contract."). Rather, "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends on . . . the source of the rights upon which the plaintiff bases its claim. . . ." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982), *cited approvingly by N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994); *see Gabriel*, 547 F. App'x at 831 (instructing courts to examine "two factors to determine whether [an] action is founded upon a contract for purposes of the Tucker Act": the "source of the rights" and "the type of relief sought" (quoting *Megapulse*, 672 F.2d at 967–68)); *but see Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (holding plaintiff's claim sounded in contract, not tort, based upon "source of rights" analysis only).

The Ninth Circuit has applied this legal framework in several instances and, in doing so, has elucidated where in the sand it draws the line to determine whether an action sounds in tort or contract for jurisdictional purposes. On the one hand, the Ninth Circuit has held in a line of cases beginning with *Woodbury v. United States*, 313 F.2d 291, 295 (9th Cir. 1963) that where a "'tort' complained of is based entirely upon breach by the government of a promise made by it in a contract, so that the claim is in substance a breach of contract claim, and only incidentally and conceptually also a tort claim, we do not think that the common law or local state law right to '. . . sue in tort' brings the case within the Federal Tort Claims Act." *Id.* at 295. *Woodbury* involved a real estate developer who obtained financing from the Federal Housing Administration ("FHA") in the form of an "interim construction loan" to build housing for Navy personnel at a base in Alaska. The project was marred by financial difficulty, and when the FHA foreclosed, the plaintiff sued the

FHA for breach of fiduciary duty premised upon the FHA's failure to arrange for or provide long-term financing. The Ninth Circuit concluded that although plaintiff had styled his claim as a tort it was, in essence, a breach of contract claim because liability depended purely upon (1) the FHA's promise in the interim loan contract and (2) whether the FHA had breached that promise. *Id.* at 296–97 ("Fiduciary duty or not, there can be no liability in this case unless Woodbury can prove (1) an express or implied promise by the government, through the [FHA], to adopt and carry out a permanent long-range plan to finance the project and (2) a wrongful breach of that promise.").

Since *Woodbury*, the Ninth Circuit has held that where the elements of a claim against the Government styled as a "tort" essentially are co-extensive with what the plaintiff must allege to prove breach of contract, the FTCA does not govern, despite the plaintiff's classification of the claim. *See, e.g., LaPlant*, 872 F.2d at 881, 884 (holding claim cast as "breach of duty of good faith" under Montana law predicated upon plaintiff's loan agreement with the Farmers Home Administration ("FmHA") was substantively a breach of contract premised upon an obligation "deriv[ed] from a governmental promise as opposed to obligations externally imposed by state law"); *N. Star Alaska*, 14 F.3d at 37 (holding claim for reformation cast by plaintiff as a statutory cause of action fell within Tucker Act for plaintiff's "right to reformation is based upon the [underlying] contractual agreement itself"); *Love v. United States,* 915 F.2d 1242 (9th Cir. 1989) (holding claim for negligent undertaking of a contract did not fit within FTCA because it effectively alleged "economic harm arising out of an alleged abuse of a contractual relationship"); *cf. Performance Contracting, Inc. v United States*, 2:11-cv-2920-MCE-CKD, 2012 WL 3234210, at *1 (E.D. Cal. Aug. 6, 2012) (holding claim cast as one for negligent oversight and inspection of construction project was truly for breach of contract "because each claim depends on the interpretation of the Government's contractual obligations under" the construction contract); *United Aeronautical*, 2021 WL 794500, at *1.

21cv1202

At the same time, the Ninth Circuit in *Woodbury* recognized that some wrongs that sound in both tort and contract properly fit within the FTCA. *Woodbury*, 313 F.2d at 296. Specifically, the Ninth Circuit opined:

> We do not mean that no action will ever lie against the United States under the [FTCA] if a suit could be maintained for a breach of contract based upon the same facts [as a collateral claim sounding in tort]. We only hold that where, as in this case, the action is essentially for breach of a contractual undertaking, and the liability, if any, depends wholly upon the government's alleged promise, the action must be under the Tucker Act [and/or the CDA], and cannot be under the [FTCA].

*Id.* at 296 (citing *Aleutco Corp. v. United States*, 244 F.2d 674 (1957)). In *Walsh v. United States*, 672 F.2d 746 (9th Cir. 1982), *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547 (9th Cir. 1984), and *Love v. United States*, 915 F.2d 1242 (9th Cir. 1989), the Ninth Circuit elucidated under what circumstances a claim that can be conceptualized as sounding in both contract and tort is properly before a district court pursuant to the FTCA.

In *Walsh*, plaintiffs sold and conveyed a highway easement, which crossed lands used by plaintiffs for the pasturage of cattle. 672 F.2d at 747. Over the course of time, plaintiffs' cattle guards on the easement property became damaged and filled with dirt, snow, and debris" due to its proximity to the highway. *Id.* Plaintiffs sued the Government for negligence, alleging that the Government's deficient maintenance and repair of the easement, which, in turn, damaged plaintiffs' livestock operation. *Id.* The Government moved to dismiss the complaint for lack of subject matter jurisdiction, arguing that plaintiffs truly alleged a breach of contract predicated upon the terms of the easement. *Id.* The Ninth Circuit disagreed, finding that "the terms of the conveyance d[id] not unambiguously place a duty of repair upon [the Government]," but that duty arose from the *common law* privilege and duty of the owner of the easement to repair and maintain it." *Id.* at 748–50. Thus, the Ninth Circuit found plaintiffs' conversion claim was "essentially one sounding in tort" and distinguishable from the "tort" claim in *Woodbury*, which substantively alleged breach of contract. *Id.*

- 17 -

In *Fort Vancouver Plywood*, the Ninth Circuit clarified that where tort "[l]iability is not established exclusively by contract," a claim may be permitted under the FTCA "even if liability did arise because of contract obligations." 747 F.2d at 552 (citing *Woodbury*, 313 F.2d at 291, and *Walsh*, 672 F.2d at 746). There, plaintiff entered a timber sales contract with the United States Forest Service ("USFF"). After plaintiff had cut and prepared the timber pursuant to the contract, but before the timber was removed, an adjacent site at which the USFF was conducting a "slash and burn" operation caught fire. *Id.* at 549. That fire crossed over to plaintiff's site, destroying the timber. *Id.* Plaintiffs sued the USFF in district court, alleging that it had negligently performed the slash and burn operation. The Government moved to dismiss the action for lack of subject matter jurisdiction, arguing that the claim arose under the sales contract and, thus, Woodbury, not *Walsh*, controlled. *Id.* at 550–51. The Ninth Circuit disagreed, opining that the sales contract was only remotely relevant to the elements plaintiffs would be required to prove in order to establish the USSF had been negligent in its slash and burn operation. *Id.* at 551–52. In so holding, the Ninth Circuit found significant that the timber contract "d[id] not allocate liability under the circumstances presented"; rather, the contract "establishe[d] ownership interests [in the timber], but otherwise [was] not implicated" by plaintiff's negligence claim. *Id.*

Finally, the Ninth Circuit reiterated in *Love* that district courts may retain jurisdiction pursuant to the FTCA over a claim "could have been brought as a breach of contract claim, but [that] equally support[ed] a tort claim." 915 F.2d at 1246. In *Love*, plaintiffs—Montana farmers—entered into agricultural loans with the FmHA secured by a chattel mortgage on plaintiff's livestock and machinery. *Id.* at 1244. When plaintiffs defaulted on the loan, the FmHA instituted bankruptcy proceedings pursuant to which plaintiffs' livestock and machinery were sold. *Id.* Plaintiffs instituted an action in district court asserting, *inter alia*, the FmHA had converted their livestock and machinery when it

wrongfully instituted the bankruptcy sale.[14]  *Id.*  The Government moved for dismissal of under Rule 12(b)(1) on the ground plaintiffs' conversion claim was, in substance, a claim for breach of the loan agreement.  As in *Walsh* and *Fort Vancouver Plywood*, the Ninth Circuit disagreed.  *Id.* at 1247.  The Ninth Circuit reasoned that plaintiffs' conversion claim fell within the FTCA because plaintiffs' success on the merits of that cause of action did not "depend[] wholly upon the government's alleged [breach of] promise" but on plaintiffs' "claim of ownership and possession of property."[15]  *Id.*  Accordingly, the Ninth Circuit held that plaintiff's conversion claim in *Love* did not resemble the breach of fiduciary duty in *Woodbury*.  *Id.*

Here, the Government contends that the instant action is governed by the *Woodbury* line of cases, whereas Plaintiffs assert conversely that the Ninth Circuit's precedent under *Walsh*, *Fort Vancouver Plywood*, and *Love* controls.  In the Court's view, the jurisdictional question at the heart of the Motion is not a close call.  This is not an action in which a breach of contract merely lies in the background of Plaintiffs' negligent undertaking claim or, as Plaintiffs describe it, one in which a contract incidentally supports but one element of an otherwise independent state law tort.  Rather, this action is paradigmatic of the sorts described by the Ninth Circuit in *Woodbury*, where the Government's liability "depends wholly upon the government's alleged promise," and, thus, is under the Tucker Act or CDA, not the FTCA.  313 F.2d at 296; *cf. Performance Contracting*, 2012 WL 3234210 at *1.  Plaintiffs' allegation that the Navy owed to NASSCO a duty to perform with reasonable care "inspection and oversight services" is lifted straight from Section 4.9.3.2.1 of Military Standard 1625D.  (*Compare* Compl. ¶ 60 *with* Military Standard 4.9.3.2.1.)  Moreover, Plaintiffs' "breach" allegations rely exclusively upon the assertion that the Navy failed to oversee control inspections in the manner prescribed in Sections 4.9.3.2.1 and 5.2

---

[14] Plaintiffs also alleged that FmHA had negligently undertaken services pursuant to the loan agreement.  *Love*, 915 F.2d at 1246.

[15] As explained at *supra* page 16, however, the Ninth Circuit found that FTCA jurisdiction *did not* extend to plaintiffs' negligent undertaking claim, which effectively alleged "economic harm arising out of an alleged abuse of a contractual relationship."  *Id.* at 1248.

of Military Standard 1625D—no other basis for finding breach is alleged in the Complaint. (Compl. ¶ 61 (alleging the Navy "breached" its duty of care owed to NASSCO by "fail[ing] to comply" with Military Standard 1625D and citing several sub-provisions of Sections 4.9.3.2.1 and 5.2 with which the Navy purportedly failed to abide, by way of example).) In sum, Plaintiffs' negligent undertaking theory in the instant action does nothing to render the Navy liable for any independent state tort that does not depend on the Navy's purported breach of the Contract.

Put differently, there can be no question Plaintiffs' "negligence" claim is contractually based because it requires the Court to decide what NASSCO's rights were pursuant to the Contract and Military Standard 1625D in order to determine whether Plaintiffs establish duty, breach, and even damages. *See Tucson Airport Auth.*, 136 F.3d at 647 (finding claim styled as tort to be contractually-based where plaintiff was "asking the district court to decide what its contract rights [were]"); *Performance Contracting*, 2012 WL 3234210, at *4 ("Each of Plaintiff's causes of action is essentially one for breach of contract because each claim depends on the interpretation of the Government's contractual obligations under the General Contract.").   Indeed, the Court cannot even assess what amount, if any, Plaintiffs are entitled, assuming *arguendo* they establish liability, without wading into the morass of interpreting the Contract and Military Standard 1625D's liability clauses.  (Contract 69–70 (immunizing Navy from liability "for any loss, damage, liability or expense caused by, resulting, or incurred as a consequence of delay or disruption of any type whatsoever"); Foreword ¶ 5, Military Standard 1625D (stating NASSCO shall be solely responsible for maintaining and operating" the graving dock).)[16]   But district courts

---

[16] Plaintiffs attempt to sidestep this issue entirely by alleging they seek only "losses from the Incident which are recoverable from the United States (those which are not 'a consequence of delay or disruption')," and by asserting that Military Standard 1625D does not contain language necessary under California law to limit liability.  (Opp'n 12.)   However, there clearly is a dispute between the parties as to both the scope of "delay and disruption" within the meaning of the Contract and the effect of the liability limitations in Military Standard 1625D.  (*See supra* Sec. II.A (explaining federal law—not California law—governs the contracts to which the Government is a party).)  Thus, the Court does not foresee any circumstance under which interpretation of the liability-limiting provisions of the Contract and Military Standard 1625D will evade its analysis, should the Court reach the question of damages.

are forbidden from undertaking federal-contract interpretation to resolve claims that, in substance, allege the Government breached an express contract for services and the claimant seeks over $10,000 in damages.  *United States Marine, Inc. v. United States*, 722 F.3d 1360 (Fed. Cir. 2013) ("[W]hen there is no other jurisdictional grant covering a contract claim already covered by the Tucker Act, that Act's conferral of jurisdiction on the [Court of Federal Claims] is exclusive because no other grant exists." (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988))); *see also LaPlant*, 772 F.2d at 884 (holding Tucker Act's policy goal is to "ensur[e] uniformity in the interpretation and application of the obligations attaching to governmental contracts," which the Tucker Act (and the CDA) achieve by remitting such claims to the Court of Federal Claims).

Plaintiffs acknowledge that its negligence claim is derived from the Contract but assert that there also exists independent tort liability under California's doctrine of negligent undertaking of services. (Opp'n 8; Compl. ¶ 59 (alleging that California also recognizes the negligent undertaking doctrine contained in Section 324A of the Restatement Second of Torts).)[17]  But the Ninth Circuit has made clear a [state's] law's characterization of an action . . . as an action sounding in tort [cannot] control our inquiry." *See LaPlant*, 74 F.2d at 882–83 ("); *Performance Contracting,* 2012 WL 3234210, at *5 (similar).  Indeed, the Ninth Circuit instructs federal district courts to "ignore . . . state law characterizations of [a] claim" when classifying a claim as tortious or contractual, and "focus instead on substance," *i.e.*, the source from which the rights upon which a plaintiff predicates its claim emanate.  *LaPlant*, 74 F.2d at 882–83; *see N. Star Alaska*, 14 F.3d at 37.  Thus, it matters not that California law recognizes an independent tort claim for negligent undertaking of services where, as here, that tort is "wholly dependent" upon

---

[17] Plaintiffs also argue in their opposition that the Navy owed Plaintiffs a duty of care arising out of its exercise of control over the Basin.  (Opp'n 8.)  But the Complaint does not allege any such duty, nor does the Complaint allege the Navy exercised any degree of control over the Basin or graving dock—it alleges only that the Navy was obligated to provide oversight of control inspections.  The Court will not consider a theory of negligence Plaintiffs proffer in their Opposition without any predicate in the Complaint.

Plaintiffs' contractual rights and the Navy's contractual obligations explicitly set forth in the Contract and Military Standard 1625D. *See Woodbury*, 313 F.2d at 296.

This Court's conclusion that the instant action falls outside the contours of the FTCA is consistent with the Ninth Circuit's decisions in *Walsh*, *Fort Vancouver Plywood*, and *Love*. Those decisions do not alter the central holding in *Woodbury* that where a claim styled as a tort is "based entirely upon breach by the government of a promise made by it in a contract" the FTCA does not apply. *Love*, 915 F.2d at 1248. An examination of the source of the rights upon which Plaintiffs' claim rests lays bare that that is precisely the case here.

Accordingly, the Court finds that Plaintiffs have failed to establish their claim falls within the FTCA and, therefore, that the Court has subject matter jurisdiction over this action.

\*   \*   \*   \*

Having concluded this Court lacks subject matter jurisdiction under the FTCA, the Court need not address the remaining arguments in the Motion. *See Maya*, 658 F.3d at 1068 (9th Cir. 2011). Accordingly, the Court holds that Plaintiffs' claim must be brought, if at all, before the Court of Federal Claims pursuant to the waivers of immunity in the Tucker Act and CDA. *See* 28 U.S.C. § 1491(a)(1) (granting Federal Court of Claims jurisdiction over breach of contract actions against Government exceeding $10,000 in damages); 41 U.S.C. § 7102 (granting Federal Court of Claims jurisdiction over action for breach of contract actions against Government in which underlying contract was made by "an executive agency for . . . the procurement of services [or] the . . . maintenance of real property"). The Navy's Motion is thus **GRANTED** with leave to amend.

//
//
//
//
//

- 22 -

**IV.   CONCLUSION**

For the reasons stated above, the Motion is **GRANTED WITHOUT PREJUDICE** to leave to amend.  Plaintiffs may file an amended complaint **by no later than <u>May 20, 2022</u>**.

**IT IS SO ORDERED.**

**DATED: April 28, 2022**

Hon. Cynthia Bashant
United States District Judge

21cv1202